UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| STATE FARM FIRE AND CASUALTY COMPANY, § § § Plaintiff, § § v. § MATTHEW LANGE, § § Defendant. § § § | CIVIL ACTION NO. H-09-2011 |

## MEMORANDUM AND ORDER

Pending before the Court are Motions for Summary Judgment filed by Plaintiff State Farm Fire and Casualty Company ("State Farm") (Doc. No. 68) and by Intervenors Dawn Morgan, Mary Elizabeth Rubio, and Linda Miller[1] (the "Intervenors") (Doc. No. 67). Having considered the parties' filings and the applicable law, the Court finds that State Farm's motion should be granted and that the Intervenors' motion should be denied.

I.   BACKGROUND

This is a declaratory judgment action arising out of a one-vehicle automobile accident on February 5, 2009 in Victoria, Texas in which Defendant Matthew Lange ("Lange") was the driver. Two of the passengers in Lange's car, Ryan Castellano and Stephen Rubio, were killed as a result of the accident. The sole issue for determination in this case is whether Lange was insured under his parents' Personal Liability Umbrella Policy (the "Policy") at the time of the accident, and thus whether State Farm has a duty

---

[1] Morgan intervenes as next friend of Karisa Rubio, a minor; Rubio as next friend of Kegan Rubio, a minor; and Miller both individually and as personal representative of the estate of Stephen Rubio.

1

to pay on behalf of and/or indemnify Lange for damages resulting from the accident, and to defend Lange against any lawsuits or claims resulting from the accident.

The Policy provides that State Farm will compensate, and defend lawsuits against, any "insured" for damages resulting from losses for which the insured is legally liable and to which the policy applies. (Doc. No. 68-2, at 9.) The Policy defines "insured" in relevant part as "**you** and **your relatives** whose primary residence is **your** household," meaning the home of Lange's parents in Meyersville, Texas ("Meyersville address" or "Meyersville house"). (*Id.* at 5 (emphasis in original).) The parties agree that whether Lange was covered by the policy at the time of the accident depends entirely on whether the Meyersville address was Lange's "primary residence" at that time.

The dispute over Lange's primary residence stems from the fact that, in the year leading up to the accident, Lange spent the majority of nights at an apartment in Victoria, Texas ("Victoria address" or "Victoria apartment") rather than at his parents' house. (*See* Doc. No. 68-7, Lange Dep, July 8, 2010, at 129.) State Farm argues that the Victoria address was Lange's primary residence, and so he is not covered by the Policy. The Intervenors argue that, notwithstanding Lange's use of the Victoria apartment, the Meyersville address remained his primary residence.

Lange first moved to the Meyersville residence with his parents when he was around 10 years old, in approximately 1996. (Doc. No. 68-7, Lange Dep., July 8, 2010, at 13, 92.) He attended grade school there and graduated from high school in nearby Cuero in 2004. (*Id.* at 16.) In 2005, Lange began working in Victoria and living during the work week in a rental home there. (*See* Doc. No. 68-4, at 28, Rental Application for Victoria Apartment.) In 2007, he began attending a vocational school in Victoria, from which he

obtained a welding certificate in August 2008. (Lange Dep. at 16, 46.) He has now been employed as a welder at Stewart & Stevenson in Victoria for the past three years. (*Id.* at 21-22.) In his deposition, Lange testified that he rented the Victoria apartment because "[i]t was closer to work, and I was in school at the time taking night classes" in Victoria, and regularly worked twelve-hour-long shifts followed by four hours of welding school. (*Id.* at 33-35.)[2] Although he stayed in the Victoria apartment during the work week, Lange testified that he would spend most weekends at the Meyersville house. (*Id.* at 140 (in a given month, Lange would spend the weekend in Meyersville "at least two times," most months "three times," and some months "every weekend").) Those weekends, Lange generally spent both Friday and Saturday nights in Meyersville, although "occasionally" he did not go to Meyersville until Saturday. (*Id.* at 113.) Lange had his own key to the Meyersville house, could come and go as he pleased, and could freely use the resources in the house. (Doc. No. 68-12, Marilyn Lange Dep., Nov. 5, 2010, at 30-34.)

At the time of the accident, Lange testified that he maintained his childhood bedroom at the Meyersville address, and kept "all [of his] prize possessions" and "valuable stuff" there, including his firearms, four-wheeler vehicle, good clothes, trophies, photographs, and his two pet dogs. (Lange Dep. at 37-46.) By contrast, Lange described the Victoria apartment as containing only "basic things just to get by the day with," such as a bed, "two different color couches," and a "plastic tool box" for a TV stand. (*Id.* at 37-38.)

---

[2] Lange also stated in his conversation with State Farm employee Diana Osterhout that the reason he moved into the Victoria apartment was because "it was about 45 minutes closer to work." (Doc. No. 68-9, at 2.)

3

Both the Meyersville and Victoria addresses appear on various forms and registrations that Lange filled out. The Meyersville address was listed on his driver's license,[3] tax returns, four-wheeler vehicle registration, personal State Farm auto insurance policy, voter registration, and the majority of bills and important mail. (*Id.* at 27-28, 40, 41, 59, 174.) Lange also listed the Meyersville address on his vocational school enrollment on September 4, 2007. (Doc. No. 70-1, at 10.) On the other hand, the Victoria apartment was listed on the purchase, title, and loan documents for Lange's truck and on his Wells Fargo and Texas Dow Employees Credit Union accounts. (Doc. No. 68-5.) In applying to live in the Victoria apartment, Lange listed his "[c]urrent home address (where you now live)" as the rental house in Victoria. (Doc. No. 68-4, at 28.) The utilities for the Victoria apartment were in Lange's name. (Doc. No. 68-4, at 10.) Lange also listed his father on loan and apartment lease applications as a person who would not be living with him. (Doc. No. 68-4, at 28; Doc. No. 68-5, at 24.)

Various statements and testimony by Lange and his parents can be interpreted to support either location being his "primary residence." In an interview with State Farm employee Diana Osterhout, Lange stated that he lived in the Victoria apartment. (Doc. No. 68-9, at 1.) Lange also signed a statement in this case stating: "At the time of my motor vehicle accident on February 5, 2009, my primary residence was my apartment in Victoria, Texas. I did still receive some of my mail at my parents['] house and stayed from time to time." (Doc. No. 68-11.) Lange's father testified in his deposition that he would probably have said his son lived in the Victoria apartment on February 1, 2009 had he been asked that day. (Doc. No. 68-4, Stephen Lange Dep., Aug. 30, 2010, at 77.)

---

[3] Lange's driver's license was issued before he moved into the Victoria apartment and did not need to be renewed until after he began staying with his parents full-time again after the accident. (Lange Dep. at 131-32.)

4

Lange's mother viewed her son's move to Victoria as "permanent," and said that her son did not live with her at the time of the accident. (Marilyn Lange Dep., at 17-20; Doc. No. 68-10, Interview Between Diana Osterhout and Marilyn Lange, at 1-2.) She testified that Lange had considered moving back to Meyersville if his job was cut, but at the time of the accident his job was not in danger. (Marilyn Lange Dep. at 20-22, 45.) Lange also acknowledges that prior to the accident there was no specific date on which he planned to move back to the Meyersville house full-time. (Lange Dep. at 136.) Moreover, four months remained on Lange's second extension of the Victoria apartment lease at the time of the accident. (Doc. No. 68-4, at 11.)

On the other hand, Lange told Osterhout that he viewed staying in the Victoria apartment as a "temporary move," that he stayed overnight at the Meyersville house "the majority of weekends," that he kept his "expensive stuff" in Meyersville, and that he moved into the Victoria apartment because it was "about 45 minutes closer to work." (Doc. No. 68-9, at 1-3.) Lange also described the Victoria apartment as "temporary" and "really just somewhere to sleep" in his deposition. (*See, e.g.*, Lange Dep. at 47, 50.) He testified that, prior to the accident, he periodically discussed his desire to move back with his parents so he could save money to buy a house for himself. (*Id.* at 121-22, 136-38.) Furthermore, Lange later recanted some of his prior statements in which he identified the Victoria apartment as his "primary residence." In his deposition, Lange testified that the Meyersville address has been his primary residence since he was 10 years old. (*Id.* at 18.) He testified that, if Osterhout had asked him at the time, he would have said that his "primary residence was the Meyersville address and the apartment was temporary." (*Id.* at 74.) He also testified that, when he signed the statement, he did not know the legal

meaning of the term "primary residence," and agreed when asked whether the written statements was "180 degrees different" from what he had told Osterhout and from his testimony. (*Id.* at 80.) Lange's father also testified that he considered the Meyersville house to be his son's "primary residence" while his stay in the Victoria apartment was a "[t]emporary" move. (Stephen Lange Dep., at 38-39.)

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. Fed. R. Civ. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. Fed. R. Civ. P. 56(e)(1); *see, e.g., Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### III. APPLICABLE LAW

The Court has jurisdiction in this case based on the diversity of the parties. (Doc. No. 5, Am. Compl., ¶ 4; *see* 28 U.S.C. § 1332(a).) Accordingly, the case is governed by Texas substantive law. *Beavers v. Metropolitan Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009); *see also Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). As the parties acknowledge, Texas courts have not construed the term "primary residence" in the context of an insurance policy. (*See* Doc. No. 68, at 6; Doc. No. 70 at 2-3.) In cases such as this, where "no state court decisions control," the task of a federal district court is to "make an '*Erie* guess' as to how the Texas Supreme Court would apply state law." *Beavers*, 566 F.3d at 439 (citation omitted). Thus, this Court must determine how the Texas Supreme Court would interpret the insurance policy under Texas law. In doing so, the Court "may consult a variety of sources, including the general rule on the issue, decisions from other jurisdictions, and general policy concerns." *Travelers Cas. and Sur. Co. of Amer. v. Ernst & Young LLP*, 542 F.3d 475, 483 (5th Cir. 2008) (citation omitted).

"In Texas, insurance contract interpretation is governed by general contract interpretation rules." *Texas Farmers Ins. Co. v. Murphy*, 996 S.W.2d 873, 879 (Tex. 1999). The Texas Supreme Court's "goal is to give effect to the written expression of the parties' intent, viewing the contract in its entirety, consistent with applicable rules of law." *Id.* "In construing the insurance policy, [Texas courts] look to the plain language of the contract, and such language will be given effect when the parties' intent may be discerned from that language." *Blaylock v. Amer. Guarantee Bank Liability Ins. Co.*, 632 S.W.2d 719, 721 (Tex. 1982). "However, when the language used is subject to two or

more reasonable interpretations, the construction which affords coverage will be adopted." *Id.*

## IV. ANALYSIS

As noted above, the outcome of this case depends entirely on which dwelling is found to have been Lange's "primary residence" within the meaning of the Policy at the time of the accident. The parties disagree both about the appropriate interpretation of the term "primary residence" and about the application of the facts of this case to that interpretation.

### A. Meaning of "Primary Residence"

"Primary residence" is not defined in the Policy, nor have Texas courts interpreted its meaning in the insurance context. The Court must first determine whether the term is ambiguous. In Texas, whether a term is ambiguous is a question of law. *National Union Fire Ins. Co. of Pittsburgh, PA v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). "If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous." *Id.* "An ambiguity does not arise, however, merely because the parties advance conflicting contract interpretations." *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 465 (Tex. 1998). "If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous." *CBI Industries*, 907 S.W.2d at 520. If a term is found to be ambiguous, it must be resolved in favor of coverage. *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008); *see also Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984) (ambiguous terms must be "strictly construed in favor of the insured in order to avoid exclusion of coverage").

The Court finds that "primary residence" is unambiguous as a matter of law. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Harris*, 882 So.2d 849, 853-54 (Ala. 2003); *Wallace v. State Farm Mut. Ins. Co.*, 2007 WL 4216132, at *3 (Ohio Ct. App. Nov. 30, 2007); *Bauer v. USAA Cas. Ins. Co.*, 720 N.W.2d 187, 188 (Wis. Ct. App. 2006); *see also CBI Industries*, 907 S.W.2d at 522 ("[c]ourts usually strive for uniformity in construing insurance provisions," including as to whether there is ambiguity). "Primary" means "first in rank or importance," "chief," or "principal." Webster's Third New International Dictionary (1966); *see also* Merriam-Webster's Collegiate Dictionary (1998) ("of first rank, importance, or value"); Random House College Dictionary (1982) ("most important or essential; chief; principal"); American Heritage Dictionary (2d College ed. 1982) ("Being first or best in degree, quality, or importance"). Thus, a person can only have one "primary residence" for purposes of this policy. *See, e.g., Bolin v. Progressive Northwestern Ins. Co.*, 2009 WL 1010770, at *8 (E.D.Mo. Apr. 9, 2009).

That "primary residence" is the person's residence that is most important based on all relevant considerations. Relevant factors in this inquiry include (but are not limited to):

- how often a person stays at a residence;
- how transient he is;
- how long he has resided in a residence;
- where he keeps his belongings;
- whether he lists a residence on important documents, including as his "permanent address";
- whether he owns or rents—and if he rents, the length of the lease;
- whether he has plans, or will be required, to vacate a residence;
- whether he contributes to maintenance, upkeep, property taxes, or other costs;
- whether he shares a residence with others;
- whether blood or legal relationships exist between him and others living in either residence;
- whether he has full and free access to a residence and its contents;
- the subjective views of the person and other people living in his residences.

Where a person spends the majority of his time is the most important factor, but no one factor is dispositive, and the determination of the primary residence should be based on a totality of the circumstances. Thus, although a person's "primary residence" will generally be the dwelling in which he spends the majority of his time, strong evidence indicating that a different dwelling is in fact the "most important" may overcome the quantitative factor.

The Court disagrees with State Farm's proposed test for primary residence, which would look only at where a person spends the majority of his time. To look only to that quantitative element would ignore a number of relevant factors and would favor the wrong "primary residence" in many cases. In addition, the purely quantitative standard is not as clear-cut as it suggests—for example, a court would still need to determine how far back in time to look for the quantitative inquiry. Accordingly, other courts have looked to multiple, qualitative factors in determining a primary residence for insurance purposes. *Riddle v. Auto-Owners Ins. Co.*, 2009 WL 412449, at *3 (E.D.N.C. Feb. 18, 2009) ("The 'slippery' nature of the relevant terms necessarily means that whether a home is one's 'primary residence' is an intensive fact-driven inquiry and one in which an insured's intent will be center stage."); *Dwelle v. State Farm Mut. Auto. Ins. Co.*, 839 So.2d 897, 899-900 (Fla. Dist. Ct. App. 2003) (considering intent, individual's financial dependence on parents, whether individual had commenced living in an apartment "on a permanent basis," and whether he had "abandoned his residency at his parents' home"); *Wallace v. State Farm Mut. Ins. Co.*, 2007 WL 4216132, at *3-4 (Ohio Ct. App. Nov. 30, 2007) (noting that "decedent apportioned her time living with both of her parents," and considering address listed on school records, driver's license, and employment

applications along with testimony by mother about why father's address was listed); *Bolin v. Progressive Northwestern Ins. Co.*, 2009 WL 1010770, at *8 (E.D.Mo. Apr. 9, 2009) (considering "bank records, vehicle registration records, and other documents").[4] Thus, the Court finds that a qualitative, totality-of-the-circumstances inquiry is appropriate.[5]

## B. Application to the Facts of the Case

Applying the factors listed above to this case, the evidence demonstrates that Lange's "primary residence" was the Victoria apartment. First, it is undisputed that, for at least thirteen months prior to the accident, Lange stayed in Victoria the majority of the time. He did not even spend all weekends at his parents' house in Meyersville. Moreover, his stay in Lange spanned two different jobs and the time before, during, and after he attended welding school there. Second, the Victoria apartment was listed as Lange's address on a number of official documents, including the purchase, title, and loan documents for his truck and on his bank and credit-card accounts. Lange had also listed his previous rental house in Victoria as his "[c]urrent home address (where you now live)" when applying to move into the Victoria apartment, and on at least two occasions

---

[4] To the extent that a few courts in other states have looked only to where an individual spent the majority of his time, the Court disagrees with that standard and finds it appropriate to consider other facts that relate to which residence is the most important. *See Bonich v. State Farm Mut. Auto. Ins. Co.*, 996 So.2d 942, 945 (Fla. Dist. App. 2008) ("coverage turns on the quantity of time that the relative actually resides with the named insured"); *Jenks v. State Farm Mut. Ins. Co.*, 2005 WL 602560, at *2 (Mich. App. Mar. 15, 2005) ("reasonable minds could not differ in concluding that plaintiff did not reside there "primarily" when he spent the majority of his time living in his father's house"); *Haydel v. State Farm Ins. Co.*, 935 So.2d 171, 174 (La. Ct. App. 2006).

[5] The Court acknowledges that the discrepancy between the competing standards for interpreting the "most important" residence could be seen as an ambiguity in the contract term. Although the precedents from other jurisdictions could be read as suggesting ambiguity in the contract term, the Court does not believe that such precedents lead to the conclusion that the contract must be construed against the insurer and coverage held to exist. Almost every term in standard insurance contracts has been the subject of litigation through the years. Courts have not held, however, that precedents that are less than consistent necessarily result in a finding that coverage does exist. Even if that were the case, the outcome would not change because the totality of the circumstances standard that the Court adopts is the interpretation that most favors coverage in this case.

11

listed his father as a person who would not be living with him. Third, Lange had no specific plans to move out of his parents' house, and had four months remaining on an extended lease at the Victoria apartment. Furthermore, his mother viewed his move as permanent, and did not consider them to live together. These factors, particularly when taken together, suggest the establishment of a new primary residence in Victoria rather than a temporary stay away from his parents' house.[6]

The Court acknowledges that there is a good deal of evidence tending to show that the Meyersville address was Lange's primary residence. Among other things, Lange had full and free access to his parents' house, kept many of his valued belongings there, and listed it on a number of important documents. In addition, Lange and his father both testified that the move to Victoria was "temporary," and Lange testified that it was "just somewhere to sleep" that contained only the bare essentials. That is not enough, however, to overcome the stronger evidence supporting a finding that the Victoria apartment was his primary residence, including that the fact that he spent the majority of his time there. The Court has found no case in any jurisdiction with similar facts in which the term "primary residence" was determined so as to afford coverage.

The Intervenors cite *Harris County Appraisal Dist. v. Wilkinson*, in which a couple was denied a homestead tax exemption that applied only to their "principal residence" on January 1, 2004. 317 S.W.3d 763, 766 (Tex. App.—Houston [1 Dist.] 2010, pet. denied). The couple temporarily moved into a mobile home in December 2003

---

[6] The outcome might be different if, for example, the evidence uniformly portrayed the Victoria apartment as a place to which Lange commuted for the duration of each work week, while retaining nearly all prior ties to the Meyersville home and invariably returning to Meyersville on the weekends. Similarly, if the Meyersville home were listed on all of Lange's important documents, or if Lange had a date certain upon which he would move back to Meyersville full-time, the Court might find that the Meyersville address was his primary residence.

after moving out of their previous house but before their new house was ready for occupancy, and the mobile home was listed on bank statements and the husband's driver's license. *Id.* at 764-65. The court ruled that the mobile home was not their "principal residence" because they intended for it to be a temporary residence. *Id.* at 767. *Wilkinson* is distinguishable from the instant case because Lange had lived away from the Meyersville house for much longer than a few weeks, and had not expressed a clear intent to move back to Meyersville in the near future. In addition, *Wilkinson* involved a provision of the Texas Tax Code under which the term "principal residence" was interpreted to mean "that home which the Wilkinsons considered to be their main or primary residence." *Id.* That standard, unlike the one adopted by courts in the insurance context, is entirely based on subjective intent. Such a standard ignores many factors that are relevant to the "primary residence" inquiry, and the Court declines to adopt it.[7] Finally, the *Wilkinson* court also discussed a tax code provision that specified:

> A qualified residential structure does not lose its character as a residence homestead when the owner who qualifies for the exemption temporarily stops occupying it as a principal residence if that owner does not establish a different principal residence and the absence is:
> (1) for a period of less than two years and the owner intends to return and occupy the structure as the owner's principal residence . . . .

Tex. Tax Code § 11.13(l) (Vernon 2008) (cited in *Wilkinson*, 317 S.W.3d at 767). Such an established rule regarding the change in a person's principal or primary residence is not present in the instant case. Accordingly, the Court is not persuaded that *Wilkinson* commands a finding that Lange's primary residence is the Meyersville address.[8]

---

[7] The *Wilkinson* court also noted that "[i]n the particular context of this provision of the Tax Code, . . . exemptions from taxation are not favored by the law and will not be favorably construed." *Id.* at 766.

[8] The Court finds that the deposition testimony that the Intervenors submit from State Farm claims representative Elisa McAtee concerning the term "primary residence" is irrelevant. It consists largely of McAtee's opinions regarding a legal term and does not have "any tendency to make the existence of any

13

Viewing the evidence in the light most favorable to Lange and the Intervenors, there are no disputed material facts that could alter the determination of Lange's primary residence under the Policy. Therefore, Lange is not an "insured" under the Policy, and the Court finds it appropriate to grant State Farm's Motion for Summary Judgment and deny the Intervenors' Motion for Summary Judgment.

The Court recognizes all the many reasons that its decision will strike many as both unfair and wrong. The case began with tragedy, as two lives ended violently and prematurely. That the prospects of recompense for the bereaved families should depend on a Court's determination of primary residence is a procedural anomaly that little comports with any coherent social policy. But, this Court's mission is to apply and enforce the law. The Court has no portfolio—even if it should want one—to invent policy that trumps law. Still, the Court's sympathy is genuine.

## V. CONCLUSION

For the reasons discussed in this order, State Farm's Motion for Summary Judgment is GRANTED, and the Intervenors' Motion for Summary Judgment is DENIED.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 18th day of January, 2011.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

---

fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.